IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 4, 2015 at Jackson

## RIVERA L. PEOPLES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-459      Cheryl Blackburn, Judge**

_____

**No. M2014-02441-CCA-R3-PC – Filed September 17, 2015**

_____

The petitioner, Rivera L. Peoples, appeals the denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Rivera L. Peoples.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Bret T. Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

Following a jury trial in November 2011, the petitioner was convicted of five counts of aggravated robbery and five counts of especially aggravated kidnapping as a result of his participation with three co-defendants in two home invasions. He received an effective sentence of 100 years in the Tennessee Department of Correction. His convictions and sentences were affirmed by this court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. State v. James L. Dowell, III & Rivera L. Peoples, No. M2012-00520-CCA-R3-CD, 2013 WL 1804191, at *1 (Tenn. Crim. App. Apr. 30, 2013), perm. app. denied (Tenn. Oct. 16, 2013).

The underlying facts were recited by this court on direct appeal as follows:

At the trial on these charges, the parties presented the following evidence: Ronald Jones testified that he and his wife, Ann Jones, lived in Antioch at the time of the home invasion. Mr. Jones recalled that, around 6:40 p.m. on November 23, 2008, four black men, all carrying pistols, entered his home wearing bandanas that covered their faces, gloves, and hats pulled down to their eyebrows. Mr. Jones estimated that the men were in their late teens to mid-twenties.

Mr. Jones testified that he picked up his wife from work at 6:30 p.m., and they drove the short distance to their home. After exiting their car, as they were walking to the front door, Mr. Jones heard a man say, "[G]et in the house, mother f***ker." Mr. Jones turned around to find four men pointing pistols at Mr. Jones and his wife. Surprised, Mr. Jones asked the men if this was a joke, to which one of the men responded, "It's not a joke, mother f***ker, get in the house." The men pushed Mr. Jones up against the front door where he fumbled for the house key and eventually opened the door. The men pushed Mr. Jones and his wife inside the house and onto the floor where two of the men held Mr. Jones and his wife down. Once inside the house, Mr. Jones said it "just seemed like chaos" with the men demanding various items and their location from the Joneses and "tearing the place up." The men were most interested in "guns, money, and PIN numbers."

Mr. Jones testified that he lived in a three-bedroom house and the men went through every room of the house. The men took several antique guns. One of the men took Mr. Jones's billfold and, after going through it, demanded Mr. Jones's PIN numbers for his bank cards. One of the men, who was sitting on Mr. Jones's back, hit Mr. Jones in the back of his head with what Mr. Jones believed to be the butt of a gun. The men were in the house for approximately forty minutes. Toward the end of this period of time, two of the men went to a nearby Regions Bank ATM to access bank funds. During this time, Mr. Jones and his wife remained on the floor at gunpoint while the two remaining men were in cellular phone contact with the two men at the ATM.

Mr. Jones testified that the two men who went to the ATM returned and "were jumping around [and] carrying on." Mr. Jones overheard one of the men, who was talking on his cellular phone, instruct someone to "pull the car up." One of the men then told the others to leave and said he was

2

going to put the Joneses behind the couch.  Mr. Jones said that, when he heard this, he thought, "this is it."  The man stood over Mr. Jones holding Mr. Jones's .45 automatic.  Mr. Jones recalled that, "He was standing over me jacking shells, pointing that gun at my head," when finally the man reached down, picked up the shells and ran out the door.  Mr. Jones jumped up and slammed and locked the door behind the man.

Mr. Jones said that, after locking the front door, he went to the back door to let his dogs in the house.  While doing so, he noticed police and an ambulance next door.  Mr. Jones ran next door and asked if anyone had seen the men leaving his house, but medical personnel and police officers were busy attending to an unrelated medical emergency and did not notice the men.  Mr. Jones told the police officers what had occurred and the officers followed Mr. Jones back to his house where they called for additional police support to assess the crime.

Mr. Jones testified that the rooms of his house were "torn all to pieces."  He said that he was not free to move about while the men were in his home.  He recalled that, at one point, one of the men asked who wanted to be shot first, and Mr. Jones volunteered, "Shoot me."

On cross-examination, Mr. Jones testified that police showed him a photographic line up, and he was unable to make an identification of any of the men.  Mr. Jones explained that it was difficult to see the intruders because his head was flat on the ground.

Ann Jones testified consistently with her husband's testimony regarding the home invasion.  She recalled that one of the men wore a "brand spanking new" pair of white tennis shoes.  She said that the men took a laptop, a camera, her son's gaming system, and guns.  After going through Ms. Jones's purse, the men began inquiring about her bank account.  Ms. Jones said that it did not appear the men had intended to use her bank card initially but decided to try to access her money through the bank once inside her home.  She recalled that, as the men decided whether the ATM card was of any benefit, they forced her to call the bank's automated system to confirm the balance in the account.  Ms. Jones wrote down the PIN number associated with her bank card and then two of the men left.  Ms. Jones said that the men accessed either $500.00 or $600.00 through the Regions Bank ATM with her bank card.  The men who went to the ATM and the men who remained with the Joneses in the house communicated by cellular phones.  Ms. Jones recalled that the men

3

threatened her saying, if her son, who lived with the Joneses, walked through the door, they would kill him.

On cross-examination, Ms. Jones testified that police showed her several photographic line ups. She identified one picture and told the detective she was "eight[y]-five percent" sure he was one of the intruders. She explained that "it was virtually impossible for us to identify somebody's looks when we couldn't see them because they were covered up and our heads were held to the floor with a gun." Even so, as to the one photograph, she said she had "a strong feeling" and there was "something about his look."

James Stadler testified that, on the night of November 23, 2008, he was at home with his daughter, Blake Stadler, and her boyfriend, Sloan Sanders. Stadler explained that the front door to his home had both a glass door and a "regular" door. At the time of these events, the "regular door" was opened, and the glass door was closed. Stadler recalled that, at around 8:30 p.m., while he and his daughter were in the "den" and Sanders was in the kitchen getting ice cream, four men entered the house through the front door. The men wore bandanas, skull caps, and gloves. Stadler said the men were black, and he estimated their ages were between "late teens" and "early twenties," based on their mannerisms. Stadler noticed a mark, he later learned was a little tattoo, near one of the intruder's eyes. One of the men walked over to Stadler and pointed a pistol at his head. Stadler, surprised by the men's entrance, pushed the gun away thinking it was "a joke." The man pulled the gun back and fired the gun into the chair in which Stadler was seated.

Stadler testified that the man ordered him to lay on the ground on his stomach. The men asked the location of Stadler's safe containing guns and money. Stadler told the men that he did not have a "safe full of cash" or any pistols. Instead, Stadler gave the men the only cash he had, $70.00 or $80.00 from his wallet. After repeated questioning, Stadler told the men that he had a safe downstairs where he kept shotguns and a small safe that contained a penny collection.

Stadler testified that the men ordered him and Sanders downstairs to open the safes. Stadler retrieved the key to the lock on the door and the combinations to the safes for the men. Stadler said that the men appeared "fairly disappointed" upon opening the safe and finding no pistols or cash. The men then pointed a gun at Stadler's head and asked where the "cash"

was, to which Stadler responded that his money was in the bank. One of the men asked if Stadler had his ATM card and, when he told the man yes, the man said, "all right, let's go."

Stadler testified that the men ordered him, his daughter, and Sanders to get into his daughter's Toyota Highlander, which was parked in front of the house. The man who shot into Stadler's chair in the house drove the car, the shortest of the intruders sat in the passenger seat while Stadler and Sanders sat in the backseat with Stadler's daughter lying on the floorboard. A third man sat in the "back area" and held a gun to Stadler's head. The fourth man followed the Highlander in a gray Buick. First, they drove to a Bank of America approximately five minutes from Stadler's house. On the way to the ATM, the driver received a phone call during which he gave the caller directions to the bank. When they arrived at the ATM, the driver attempted to withdraw $5,000.00 which is more than the daily maximum allowed for withdrawals. The driver then successfully withdrew $500.00. He attempted to withdraw money in lowering amounts, all of which were denied until he selected $100.00, for a total of $600.00.

Stadler testified that they next went to his daughter's bank, which was nearby. The Regions Bank ATM was not a drive-through, so the driver parked the car and walked up to the ATM. After some difficulty, he returned to the car and asked Stadler's daughter for her ATM number again. She provided it, and he returned to the ATM. After some time, the man in the passenger seat appeared to be frustrated with the delay and got out of the vehicle and withdrew the money from the ATM.

Stadler testified that, after retrieving the money from both of the ATMs, he asked the men several times to take the car and let Stadler, his daughter, and Sanders go. The men ignored Stadler's repeated requests and drove to a "little subdivision." Stadler again urged the men to take his daughter's car and leave them behind. The men agreed and instructed Stadler, his daughter, and Sanders to stay in the car and count to twenty. The men exited the car and walked to the Buick which was behind the Toyota Highlander. All four men then returned, got into the Highlander, and announced there was a "change of plan." One of the men drove the Highlander about a hundred yards, stopped the car, and told the victims to get out and "don't look back." Stadler, his daughter, and Sanders got out of the Highlander and laid on the ground while the men drove away.

Stadler testified that he went to a nearby house and asked for someone to call police. When police arrived they inspected the Buick, which had the lights still illuminated and was out of gas.

Stadler testified that throughout this event the men were aggressive and threatening. He said the men poked him in the back of the head with the barrel of the gun, kicked him while he was on the floor, and threatened multiple times to kill him. Stadler recalled that the man doing most of the talking and demanding was noticeably shorter than the other three men. Stadler said that the men took a laptop computer, some coins, a hunting bag, a hunting knife, a silverware carving knife, and cash. Stadler said that, during the course of these events, he was held at gunpoint and not free to leave or move about at his own will.

Stadler testified that he was most concerned for the safety of his daughter and Sanders. He recalled that as they were driving to the first ATM, his daughter, who was on the floorboard, pulled at his pant leg. Stadler said he tried to get her to stop, but it was "like she was trying to tell [him] something or, . . . show [him] something." He told her not to move. Later, he asked his daughter why she was pulling at his pant leg and she said, "I wanted to tell you I loved you in case we die tonight."

On cross-examination, Stadler agreed that, shortly after the home invasion, he told a police officer that there were five to six black men who entered his home. He said that he had "debated back and forth" but believed there were four. On recross examination, he confirmed that there were three men in . . . his daughter's Highlander and one man in the Buick following them.

Blake Stadler testified that she was at home with her father and boyfriend on the night of November 23, 2008. Ms. Stadler recalled the events of the night consistently with her father's testimony. She added that, after she told the men where her father's wallet was located, one of the men took her to find the wallet, which contained $100.00. The man then forced Ms. Stadler to go through the drawers in the bedroom, demanding to know where money was kept in the house. Ms. Stadler described the man as "pretty violent" toward her. Ms. Stadler led the man through the house hunting for money, but was unable to find more than about $2.00. Once Ms. Stadler's father told the men that his money was in the bank, the men began discussing how they would get to the bank and access the money.

Ms. Stadler testified that, when they were getting into her car to go to the bank, one of the men shoved her to the floorboard where she remained until she was released.  Because of this position, she was unable to tell where they were driving.  Based upon the conversation in the car, she knew when they were stopped at a bank but did not know which bank or the bank's location.  The men asked Ms. Stadler for her PIN number multiple times and ultimately withdrew approximately $200.00 from her bank account.

Ms. Stadler testified that, at one point while in the house, she lost sight of her father and Sanders.  When she attempted to look for them, one of the men yanked her back by her hair.  She said that, during the encounter, the men threatened to kill her, shoved her on the ground, kicked her, and pulled her up off the ground by her hair.

Sloan Sanders testified that he was at the Stadlers' home on the night of November 23, 2008.  Sanders said that he was in the kitchen getting a bowl of ice cream when he heard what sounded like the television exploding.  He then heard Ms. Stadler screaming, "take whatever you want, take whatever you want" and realized someone was in the house with a gun.  He walked toward the living room and was met by a man pointing a gun at him.  The man ordered Sanders onto the ground next to Stadler.  The men began cursing and screaming at the victims, demanding to know where they kept guns and money.  Sanders offered that there was a hunting safe downstairs.  The men ordered him and Stadler to go downstairs and show them the hunting safe.  As they walked downstairs, one of the men pressed a gun into Sanders['] spine while another man drug Ms. Stadler upstairs.  Once in the basement, Sanders was told to get on the floor again while Stadler helped the men open the safe.  Sanders said that, at this point, the men threatened to kill him, and he believed he was going to die.

Sanders testified that eventually the men led him and Stadler back upstairs.  He described the men as not having a "solid plan" and "arguing." The men took Sanders'[] cellular phone and wallet.  Sanders recounted the trip to the banks and their release consistently with S[t]adler and Ms. S[t]adler's testimony.  He confirmed that three men exited the Highlander and then, shortly thereafter, four men entered the Highlander, and they drove a short distance before allowing Stadler, Ms. Stadler, and Sanders to exit the Highlander.

On cross-examination, Sanders testified that there were four or five men in the Stadler[s'] home. He explained it was hard to tell how many because he was lying on the floor. He said the men all wore knit hats and had bandanas covering their faces. The men wore gloves and dark clothing with long-sleeves. From the gap between the bandana and the hat, Sanders could see that the men were black.

Id. at *3-8. The petitioner was subsequently developed as a suspect, and police officers found evidence linking the petitioner to the crimes in a Chevrolet Impala that the petitioner purchased the day after the crimes were committed. Id. at *12.

The petitioner filed a *pro se* petition for post-conviction relief on December 2, 2013, and following the appointment of counsel, an amended petition was filed on March 25, 2014. In his petitions, the petitioner alleged numerous claims of ineffective assistance of trial counsel.

At the May 14, 2014 evidentiary hearing, the petitioner testified that he was currently incarcerated at the Northwest Correctional Facility in Tiptonville and that his only meeting with trial counsel was at the Charles B. Bass Correctional Facility in Nashville. He acknowledged that trial counsel hired an investigator who came with counsel to their meeting. The petitioner said that he contacted the Tennessee Board of Professional Responsibility about trial counsel's lack of communication with him. He wrote trial counsel a letter regarding several witnesses he wanted subpoenaed to testify at trial. The petitioner said he informed trial counsel that he "wasn't comfortable with going to trial with Mr. Dowell as a codefendant because Mr. Dowell had previously spoken with the prosecutor and had . . . told information that wasn't true, wasn't accurate, and it implicated [the petitioner] in[] the crime." The petitioner sent trial counsel a motion he drafted to sever his case from Mr. Dowell's, but he did not receive a response. The petitioner said he informed trial counsel that Mr. Dowell was "a very important witness" and would have testified "to the fact that [the petitioner] wasn't involved in that crime." Asked why Mr. Dowell was not present at the evidentiary hearing, the petitioner responded, "I can't – I don't put in subpoenas."

The petitioner said that he had wanted certain phone records introduced at trial because he "had an account with a phone service provider that wasn't the one that was used against [him] at trial." He claimed that those records could have established his innocence and provided an alibi defense for him. He said that he wrote trial counsel a letter asking him to obtain the records, but counsel never did so. He said that his cell phone account was with Cricket or T-Mobile. The petitioner claimed that the prepaid cell phone the State linked to him was not his. However, he admitted that the cell phone number that the State linked to him was the same number he provided to the used car

8

dealer when he purchased his vehicle. In response to questioning from the post-conviction court, the petitioner acknowledged that he did not have his phone records for the date of the offenses.

Trial counsel testified that he had been a licensed attorney since 1975 and that 100% of his practice had been criminal defense since 1995. He said that when he was appointed to represent the petitioner in the home invasion cases, the petitioner had already been tried and convicted on a murder case. He met with the petitioner on the days that he appeared in court. Counsel reviewed the discovery he received from the State with the petitioner. Counsel recalled that an investigator was retained by the petitioner's first counsel to assist in the petitioner's cases, and the investigator made at least one trip to Tiptonville to meet with the petitioner. The petitioner gave the investigator the names of people he wanted interviewed, and the investigator interviewed them. However, the investigator reported that the people "either didn't want to testify, or they said they didn't know anything that would be helpful to [the petitioner]." Trial counsel had the investigator inquire about the petitioner's phone records, but the records had been deleted by the phone carrier.

Trial counsel said that because the State advised him that it was not going to use any of Mr. Dowell's statements, there was no legal basis for a severance. Trial counsel spoke to Mr. Dowell's attorney who advised him that Mr. Dowell was not going to testify on the petitioner's behalf because "that would open him up to possible perjury charges based on statements he had already made to the contrary." Counsel said that ski masks matching the descriptions of the masks used by the perpetrators were found in the petitioner's car and that the petitioner's case "was a very strong circumstantial case." Counsel said he could not "think of a thing [he] could have done that would have altered the outcome given the State's proof."

On cross-examination, trial counsel said that the petitioner was "pretty adamant there would be some phone records that showed that phone was on the other side of town and this sort of thing." Counsel said that the phone number introduced by the State was linked to the petitioner as a result of the petitioner's writing in that number on the contract for the car he purchased. Counsel acknowledged that the petitioner filed a complaint with the Board of Professional Responsibility but said it had been resolved.

At the conclusion of the hearing, the post-conviction court advised post-conviction counsel he could have a few weeks to try to obtain the petitioner's phone records and submit them as a late-filed exhibit. The post-conviction court subsequently entered an order on November 18, 2014, denying the post-conviction petition. In its order, the post-conviction court noted that no phone records had been filed with the court and that the petitioner's counsel in his other post-conviction proceeding had been "unable to locate

some records. As Petitioner acknowledged during his testimony, the phone records obtained by his other counsel were for a different date than the date of the offenses."

## ANALYSIS

On appeal, the petitioner argues that trial counsel was ineffective for failing to adequately communicate with him, call Mr. Dowell to testify on his behalf, "file for a severance of defendants, subpoena key phone records, or otherwise mount a meaningful defense."

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

10

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In denying the petition, the post-conviction court concluded:

> The Court finds Trial Counsel's testimony to be credible and finds that Trial Counsel had more than sufficient interaction with Petitioner to properly prepare for trial. Petitioner has not provided evidence of ineffectiveness or that he was prejudiced by any alleged deficiencies; Petitioner acknowledged that he had received discovery, was aware of the phone record evidence and Co-Defendant's statements, and had already been to trial on his related case.

> Assuming, *in arguendo*, however, that counsel's visits were as substantively minimal [as] Petitioner alleges, Petitioner has still failed to show that the number of meetings he had with counsel was so deficient as to constitute ineffective assistance of counsel. Nothing in the record indicates that Trial Counsel failed to meet with the [P]etitioner and keep him informed of the proceedings. . . . Accordingly, the Court finds that the Petitioner has not shown by clear and convincing evidence that Trial Counsel's representation was deficient nor has he shown that he was prejudiced by the alleged deficiency.

> . . . .

> Petitioner testified at length during the evidentiary hearing about the State's phone records and how he was improperly linked to the mobile phone introduced at trial. Trial Counsel testified that when he came on the

11

case, he inquired about the phone records and was informed they were no longer available. Since the phone [company] advised that the records had been destroyed, Trial Counsel inquired with the State whether it had obtained any other phone records, but the State had no additional phone records in its custody. Petitioner alleges that these phone records would show that a phone registered under his name was in use in another location during the time the State alleged the pre-paid phone was used during the robbery. Petitioner did not provide said phone records during his evidentiary hearing.[1] Likewise, although Petitioner alleged during the hearing that Trial Counsel was ineffective for failing to retain a defense phone expert, Petitioner has not presented any potential witness. (footnote omitted).

If Petitioner, however, had been able to supply the phone records or a phone expert, the Court finds that it would not have changed the outcome of his trial. The State had proof that Petitioner used the number for the prepaid phone as his contact number when he purchased his vehicle thereby associating Petitioner with the phone. The fact Petitioner may have had another phone is irrelevant; records for Petitioner's alternate phone would not negate the phone record evidence introduced at trial. Further, all issues of concern were able to be addressed via the cross-examination of State witness Agent Littlehale.

. . . .

Although not explicitly raised in the Amended Petition, at the evidentiary hearing, Petitioner testified that he requested Trial Counsel to file a motion to sever his trial from Co-Defendant James Dowell, but Trial Counsel failed to do so. Trial Counsel testified that when he spoke with the State, the Assistant District Attorney advised him that the State was not using any of the Co-Defendant's statements in its case-in-chief, negating any legal basis to justify a severance. Further, Petitioner was unable to articulate a legal basis for severance. Reviewing the facts of this case, this

---

[1]The Court allowed Post-Conviction Counsel two to three weeks to provide any phone records. None were filed with the Court. The Court, however, takes judicial notice that counsel in Petitioner's other post-conviction proceeding, case no. 2010-B-1777, was unable to locate some records. As Petitioner acknowledged during his testimony, the phone records obtained by his other counsel were for a different date than the date of the offenses. As the Court set forth in its October 21, 2014 Order denying post-conviction relief in case no. 2010-B-1177, even if the phone records had been admitted at trial, they would not have altered the outcome of the trial for all the reasons addressed in this Court's October 2014 Order.

12

Court finds no basis to sever the defendants for trial under Rule 14 of the Tennessee Rules of Criminal Procedure. Petitioner has failed to meet his burden as to this issue.

. . . .

For the reasons set forth above, the Court finds that Petitioner's request for post-conviction relief is hereby DENIED. Petitioner raised several grounds within his ineffective assistance of counsel claim; however, he failed to establish by clear and convincing evidence that Trial Counsel was ineffective or that he was prejudiced by any alleged deficiency. Any grounds raised by Petitioner but not specifically addressed by this Order are found to be without merit.

We conclude that the record supports the post-conviction court's finding that trial counsel provided effective representation. Trial counsel testified that he met with the petitioner on the days that he appeared in court and reviewed the discovery he received from the State with the petitioner. The post-conviction court determined that trial counsel "had more than sufficient interaction with Petitioner to properly prepare for trial." Trial counsel testified that he spoke to Mr. Dowell's attorney who advised him that Mr. Dowell was not going to testify on the petitioner's behalf because "that would open him up to possible perjury charges based on statements he had already made to the contrary." Trial counsel further testified that because the State advised him that it was not going to use any of Mr. Dowell's statements, there was no legal basis for a severance. The post-conviction court agreed that there was "no basis to sever the defendants for trial under Rule 14 of the Tennessee Rules of Criminal Procedure." Trial counsel said he had the investigator inquire about the petitioner's phone records, but the records had been deleted by the phone carrier. The petitioner did not present any phone records at the evidentiary hearing, and the post-conviction court allowed post-conviction counsel two to three weeks to provide such records, but none were ever filed with the court. The post-conviction court determined that even if the petitioner "had been able to supply the phone records or a phone expert, . . . it would not have changed the outcome of his trial."

In sum, the petitioner has failed to show that trial counsel was deficient in his representation. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE